THE CITY OF BIRMINGHAM.

OCEAN S. S. CO. v. ROSS.

(District Court, E. D. New York. October 20, 1903.)

1. COLLISION—STEAMSHIP AND ANCHORED DREDGE.

A dredge, at work during the day in deepening the channel of the Savannah river, at night drew to the southward some 200 feet from the center line and outside of the usually navigated channel, where she was anchored in accordance with her usual custom, exhibiting appropriate lights and a green light to indicate that passing vessels should go to the north of her. A steamship passing up the river saw her lights, including the green light, when at a distance of 2,300 feet, but failed to make sufficient allowance for the ebb tide which set her to the southward, and she came into collision with the dredge, sinking her. The night was clear, the wind light, and no unusual conditions existed to prevent the steamship from passing the dredge in safety, which she would have done had she kept in the usual channel. Held, that, in the absence of any unusual conditions requiring it, the dredge was not in fault for failing to move to a greater distance from the channel, but that the collision was due solely to the fault of the steamship.

In Admiralty. Cross-libels for collision.

Benedict & Benedict and R. D. Benedict, for libelant Ross.

Wheeler, Cortis & Haight and Charles S. Haight, for Steamship Co.

THOMAS, District Judge. The above actions involve a collision between Dredge No. 7, anchored in the Savannah river, and the inbound steamship City of Birmingham, shortly after 4 a. m. on April 15th. The weather was clear, there was no wind, and the tide was strong ebb. The libelant, Ross, was using the dredge for deepening the river, pursuant to a contract with the government. On the previous afternoon the dredge had been drawn from its working position adjacent to the central line of the channel to a position to the southward thereof. While working the dredge was held in place by five lines, the stern line leading directly upstream, two breast lines leading from each side directly away from the dredge, at a point somewhat aft of the bow, and two quarter lines made fast six or eight feet forward of the stern, and leading forward. The lines were 500 or 600 feet in length, and were made fast to heavy anchors, which were placed at points marked by buoys. While the dredge was at work all the lines were kept taut for the purpose of holding·her stable. When the dredge stopped work at night, the anchors remained unchanged, but the dredge was hauled either to starboard or port, by slacking the lines on one side and drawing them in for a distance on the other side. A spud, which was a heavy timber 24 inches square and about 45 feet long, extending up and down through the center of the dredge, with a sharp steel point at the lower end, was sunk into the bottom of the river to assist in holding the dredge in place. The presence of the dredge at night was denoted by three white lights hung in a vertical line, under which was a green light, if approaching steamers were expected to pass to the north of the dredge, and a red light, if they were to pass to the south of the dredge. The drift of the tide was somewhat diagonally across the channel, whereby it tended to carry to port the Birmingham, after she turned Buoy No. 9, but as she approached Buoy No. 9 she felt the tide on her port bow. The buoy was about 2,300 feet from the bow of the dredge, or some seven lengths of the steamer, which was 320 feet long. After rounding the buoy, and thus falling under the influence of the ebb tide, she drifted southerly, her speed having been reduced to half speed shortly after passing or just before passing Buoy No. 9, and, although she reversed and went backward at full speed before the collision happened, yet she struck the bow of the dredge slightly to the starboard of the center of her bow, moving her some 25 or 30 feet northerly and westerly, so that she was lying athwart the stream, whereupon she shortly sank. The damage was of such a nature as to break off the spud, four timbers which were 4½ inches square, the head log, which was 16 by 18 inches, and cut through the forward plank, 6 by 12 inches, and into the bottom log some 6 inches. The starboard breast line was broken, and the stern line was so slackened that it was thereafter raised from the water and cut.

Two questions arise: First. Was the location of the dredge the proximate cause of the accident, and culpable? Second. Did the steamship negligently contribute to the collision?

Capt. Kirwan, of the steamship Lexington, bound upstream, about four hours before the collision, passed the dredge about 20 feet on his port hand, as he estimated. He testified: "She was near the range, but she was a little to the southward. She was to the southward of the range, but near it. I should say not more than 50 feet southward of it." This evidence illustrates the general contention of the steamship company that the dredge was in the center of the channel, or not more than 50˙or 100 feet southerly thereof. The exact location of the dredge after she sank is known. Her bow was then between 80 and 90 feet at its nearest point from the center line of the channel, while her stern was 180 feet from the center line of the channel. There is considerable evidence, much ·discussion, and more speculation, whether the dredge, after having been pushed to her port hand by the collision, was again carried farther to the southward by the ebb tide before she settled down, or whether her final location showed her nearer to the center of the channel than she was at the time of the collision. The witnesses for the libelant testify that the dredge was hauled out from 200 to 250 feet southerly of the center line of the channel. Finney, the captain of the tug that tended upon the dredge, placed the port side of the dredge within 72 feet of the starboard breast anchor, which was 340 feet from the center of the channel. Capt. Berg, of the steamship, testified, "It looked to me as if she was right in the channel;" while Dreyer, the mate, put her from 50 to 100 feet south of the range line. The evidence of Berg and Dreyer shows such inability to appreciate distances on the night in question as renders unacceptable their estimate as to the distance of the dredge from the center line of the channel, while the estimates of the witnesses for the dredge, in themselves open to criticism and doubt, are more in accord with known conditions. It is not probable that the persons who saw the dredge as she was anchored, even in the daytime, gave sufficient attention to the matter to determine within 25 or 50 feet as to her exact location, while in the night so accurate observation, if not impossible, rarely happens; and to such considerations must be added the usual erroneous estimates of distances·upon the water made by witnesses both at night and in the daytime. With all the evidence before the court, it is impossible to determine with accuracy whether the dredge was drawn 180, 200, or 225 feet from the center of the channel. The location of the dredge after she was sunk indicates that her starboard side was at least 180 feet from the center line of the channel. The dredge was drawn out on the evening before the accident by pulling on the starboard, breast, and quarter lines. The starboard quarter line ran forward to an anchor located about 250 feet south of the center line of the channel. The evidence tends. to show that the starboard bow of the dredge did not touch this line after it was drawn out. The captain of the dredge drew a diagram purporting to show the positions of the lines, whereby he made the starboard quarter line lead away from

the dredge, but afterwards corrected his diagram so as to make such line run close to the dredge. He testified as follows: "Q. You said that the starboard quarter line lay almost directly ahead? A. Almost; yes, sir." Eratich, another witness for the dredge, stated that "the starboard quarter line swung a little rightwise." It is considered that the starboard quarter line did run somewhat southerly of the starboard side of the dredge, and this view is confirmed by the fact that, if the dredge were as far south as the starboard quarter line, the steamship, in approaching the dredge as she did, would have passed in such proximity to a shoal that there is strong probability of her grounding.

Upon the whole evidence it is believed that the dredge was about 200 feet south of the center line. This left from 175 to 200 feet of clear water between her and the center line, on the north of which line was navigable water for some 400 feet. The channel was deepened by dredging for a distance of 120 feet on each side of the range line for the purpose of allowing ships of large draft to use such channel. But to the north and south of such limit there was navigable water, and, while it was the intention of vessels passing that point to keep on the range if there was no obstruction, yet it was quite safe to pass to the north or south of the range for a distance of several hundred feet, according to the draft of the vessel. Very much evidence was given as to the former custom of the dredge and other dredges in drawing out of the channel. Such evidence was offered by the steamship company for the purpose of showing, as Twiggs, the government inspector on the vessel, had stated, that she drew out the usual distance; that such usual distance was on the central line, or very near thereto. If the captain of the steamer knew of this custom, there was greater demand that he keep farther to the north for the purpose of avoiding the dredge. The steamship company contend quite correctly that there was a full opportunity for the dredge to pull several hundred feet farther to the southward. The government inspector insisted vigorously that that could not be done, because there was a shoal under her starboard side. This error he in the end renounced. The dredge could, without serious difficulty, have been drawn much farther to the southward, but this would have required the change of her anchors, and would have caused some delay both in moving her at night and restoring her to her position for work on the following morning. However, that would have been merely a matter of inconvenience, and the time consumed would not have been of great importance, if she were seriously obstructing navigation.

The problem resolves itself into this: The dredge had been withdrawn to the southward of the deeply dredged channel, and there was an abundance of room for the vessels to pass in either direction. She was not in a position where vessels would ordinarily navigate, although they might do so under the pressure of unusual conditions. She maintained the usual lights showing her presence, and exhibited the green light, which indicated to the approaching steamers that they should go to the northward of her. Before reaching Buoy No. 9, and probably a mile away, the steamship

Birmingham had seen the white lights of the dredge, and upon reaching Buoy No. 9 saw her green light. Further up the river was a red light, and in the neighborhood of Buoy No. 9 was another red light, both on the range. The simple problem for the captain of the Birmingham was to pass the green light. There was no unusual embarrassment to navigation. The conditions were precisely what he might expect to find during good weather at that time and on that tide. He knew or should have known the influence of the tide upon his vessel. His problem was simply to keep far enough to the northward to pass the green light. He left Buoy No. 9 about 50 feet on his port hand, and he never had the green light of the dredge to the southward of the red light. The steamer rounded Buoy No. 9 southerly of the range line, and never was on that line before the collision. Notwithstanding the elaboration of the evidence and the briefs submitted, it does not seem as if the case offers a serious problem. A dredge, half a mile away, signaled that an approaching steamship should go to the northward of her, and yet the steamship, with plenty of notice, made such a turn that she never got to the northward of the dredge. It seems a simple proposition that an object, clearly seen during good weather, under usually favorable conditions, should be passed, in the exercise of ordinary care. The learned counsel for the steamship contends that, although the light was seen, yet the captain of the steamer could not know how much it was to the southward of a central line. Its signal declared that it was to the southward of the central line, and directed the captain of the Birmingham to pass to starboard. There was ample water to pass to the starboard, even with the dredge on the range line; but Berg, captain of the steamship, could not help knowing that the green signal indicated that the dredge was southerly of the range line. The excuse that the ebb tide carried him to the southward is not available, for he knew that the tide was there. There was no occasion for his turning 50 feet off Buoy No. 9, nor was there any propriety in his waiting until the tide actually struck his starboard side, and was appreciably taking him to the southward, before he put his vessel hard aport. His turning too quickly around Buoy No. 9, and his failure to keep the bow of his vessel up against the tide at an earlier time, was his initial fault. It is useless to conjecture when he first slowed his wheel. He puts it at one place before turning the buoy. The mate puts it at a place after turning the buoy. The evidence of both as to how far the vessel ran before she was stopped and backed baffles possible understanding. It would seem finally, from the captain's evidence, that he did not stop and back until he was very near the dredge. Indeed, on account of the presence of the shoal there was a point of time when it would be dangerous to stop and back; and just when it should have been done, or whether, when he saw that he had been carried far to the southward, he should have gone full speed ahead, need not be decided. It is decided that he came into his danger by his own negligence in not taking a proper position in turning Buoy No. 9, or, after turning the buoy, before the tide began to carry him to the southward. His failure to do so was the proximate cause of the

accident, inasmuch as he had a plain opportunity to see where he should go, he did see where he should go, and failed to exercise proper skill and judgment in making provision for his passage by the dredge. This and other dredges had been operated for some time in the river. Other vessels passed them, and it certainly was not an unusual feat in navigation.

There is no intention of deciding that a dredge or any other vessel may, for its mere convenience, take up any position in the channel of a navigable stream, and hold another vessel responsible that shall collide with it in such a position. But when a dredge engaged in systematically deepening a channel through a long period of time has withdrawn herself beyond the limits of the usually navigated channel to an extent that accords with her usual practice, and anchored in a space that may be, but is not usually, demanded, and at the time in question is not needed, by passing vessels, and thereupon signals to such vessels that they shall pass on a certain side, and there is nothing to prevent such passage except the tide usually obtaining at the time and place, there seems no occasion for holding that the mere presence of the dredge contributed to the accident. If there were unusual conditions that made it necessary for the steamship to use that part of the channel appropriated by the anchored vessel, another question would arise.

The libelant, Ross, should have a decree, and the libel of the Ocean Steamship Company should be dismissed.